# UNITED STATES DISTRICT COURT
for the
Middle District of North Carolina

In the Matter of the Seizure of )
*(Briefly describe the property to be seized)* )
All funds on deposit, up to $603,246.37, in ) Case No. 1:24MJ 385
JPMorgan Chase Bank, N.A. acct. # 925915016, in )
the name of Prospect Health Solutions, Inc. )

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE
BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the ____Middle____ District of ____North Carolina____ is subject to forfeiture to the United States of America under ____18____ U.S.C. § 981(a)(1)(C) & 982(a)(7) *(describe the property)*:

All funds on deposit, up to $603,246.37, in JPMorgan Chase Bank, N.A. account number 925915016, in the name of Prospect Health Solutions, Inc.

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

In accordance with Rule 4.1(b)(2)(A), the Applicant appeared before me by telephone, was placed under oath, and attested to the contents of this Application, which was submitted to me by reliable electronic means.

/s/ David Yu
*Applicant's signature*

David Yu, Special Agent, FBI
*Printed name and title*

Attested by telephone LPA
~~Sworn to before me and signed in my presence.~~

Date: 10/03/24

*Judge's signature*

City and state: Greensboro, North Carolina

Hon. L. Patrick Auld, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT

I, David Yu, Special Agent with the Federal Bureau of Investigation ("FBI") state under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the following is true and correct:

## Introduction and Agent Background

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 1999. I am currently assigned to a criminal investigations squad of the Charlotte Division where my duties include the investigation of matters involving health care fraud.

2. This Affidavit is made in support of an application for a seizure warrant for the property described below:

    a. All funds on deposit, up to $603,246.37 in JPMorgan Chase Bank, N.A. Account Number 925915016 (Chase 5016) in the name of Prospect Health Solutions, Inc.

Based on the investigation described in this Affidavit, there is probable cause to believe that this property constitutes or is derived from proceeds traceable to specified unlawful activity, specifically Title 18, United States Code, Sections 1347 (health care fraud) and is therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7).

3. This investigation concerns at least two suppliers of durable medical equipment ("DME")—Dune Medical Supply LLC and Prospect Health Solutions, Inc.—and their owner Chaudhry Ahmed. As will be shown below, there is probable cause to believe that Dune Medical Supply LLC and Prospect Health Solutions, Inc. fraudulently billed Medicare for DME that was

not medically necessary, not actually ordered by an appropriate medical provider, and not actually provided. Collectively, the companies billed Medicare over $100 million over the span of less than five months, and Medicare paid the companies over $33 million.

4. The facts and information contained in this Affidavit are based on my personal knowledge, as well as information obtained from witness interviews, documents, law enforcement records, and information provided by other law enforcement officials, as well as other investigators and people involved in this investigation.

5. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a warrant, I have not included each and every fact known to me concerning this investigation. Rather, I have set forth only the facts that I believe are necessary to establish the requisite foundation for a probable cause finding to support the issuance of the requested warrant.

### Statutory Authority

6. This investigation concerns alleged violations of Title 18, United States Code, Section 1347, health care fraud, and Title 18, United States Code, Section 1343, wire fraud.

   a. Title 18, United States Code, Section 1347 prohibits (a) knowingly and willfully executing, or attempting to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program. A violation of Section 1347 is a "Federal health care offense" pursuant to Title 18, United States Code, Section 24(a).

b. Title 18, United States Code, Section 24(b) defines a "health care benefit program" as "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." Insurance companies that provide payment and reimbursement for medical services qualify as a health care benefit program. Medicare is a health care benefit program.

### Background on Medicare and DME

7. The Medicare Program is a federally funded health insurance program for eligible persons 65 years of age and older, and certain disabled persons, under which physicians, hospitals and other health care providers are compensated or reimbursed for covered medical services and supplies provided to Medicare beneficiaries. Medicare is a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b).

8. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS").

9. Medicare is subdivided into multiple program "parts." Medicare Part A covers health care services provided by hospitals, skilled nursing facilities, hospices, and home health agencies. Medicare Part B covers physician and other licensed provider services and outpatient care, including an individual's access to durable medical equipment ("DME").

10. DME includes orthotic devices, such as knee braces, back braces, shoulder braces, wrist braces, and other devices. Under Medicare Part B, beneficiaries only receive Medicare-covered DME from "suppliers" that are enrolled in Medicare.

11. DME is equipment designed for repeated use and for a medical purpose, such as orthotic devices (including back, arm, and knee braces), wheelchairs, prosthetic limbs, collagen dressing, gauze, and hydrocolloid dressing.

12. Medicare reimburses DME companies for items and services rendered to beneficiaries. To receive payment from Medicare, providers must submit or cause the submission of claims to Medicare.

13. To enroll in Medicare Part B, DME suppliers are required to submit a completed enrollment also known as the "Form CMS-855S" to Medicare. The Form CMS-855S lists many standards necessary to obtain and retain Medicare billing privileges as a DME supplier.

14. The Form CMS-855S requires applicants to disclose to Medicare any individual or organization with an ownership interest, a financial interest, or managing control of a DME supplier. This includes anyone with 5% or more of an ownership stake, either direct or indirect, in the DME supplier; anyone with a partnership interest in the DME supplier, regardless of the percentage of ownership, any organizations with "managing control" over the DME supplier, as well as any and all "managing employees."

15. The form also requires the signature of an "authorized official" who certifies, among other things, that the DME supplier will abide by all Medicare laws, regulations, and instructions and not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

16. A Medicare claim for DME reimbursement is required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name

and unique physician or provider identification number of the provider who prescribed or ordered the equipment.

17. Medicare reimburses claims for DME only if the DME was medically necessary for the treatment of the beneficiary's illness or injury, prescribed by an appropriate medical provider, and actually provided to the beneficiary as billed.

18. The proper process involves examination of the patient by a physician or other appropriate licensed medical provider. After the examination, the provider is supposed to write a prescription for the beneficiary. The prescription should contain the patient's identifying information, the DME item that the treating provider believes is medically necessary for the patient, and the diagnosis codes relating the patient's medical condition. Absent a valid certification by the treating physician/provider, Medicare lacks the statutory authority to pay the claim.[1]

19. The prescription is then provided to the DME company, which provides the necessary equipment to the patient and submits a claim directly to Medicare for reimbursement.

20. The Healthcare Common Procedure Coding System ("HCPCS" codes) are published by the American Medical Association. The codes are part of a uniform coding system used to identify, describe, and code medical, surgical and diagnostic services performed by practicing physicians and other healthcare providers. DME suppliers use HCPCS codes to identify, describe and code equipment and materials that they supply. These codes are used to determine the reimbursement.

---

[1] *See* 42 U.S.C. §§ 1395n(a)(2)(b) and 1395y(a)(1) ("No payment may be made…for any expenses incurred for items or services…which…are not reasonable and necessary for the diagnosis or treatment of illness or injury…").

## The Relevant Parties

21. Dune Medical Supply, LLC ("Dune") is a North Carolina corporation located at 2310 North Centennial Street, Suite 102 High Point, NC 27265, that purportedly provides DME to Medicare beneficiaries.

22. Prospect Health Solutions, Inc ("Prospect") is a Florida corporation located at 5460 North State Road 7, Fort Lauderdale, FL 33319, that purportedly provides DME to Medicare beneficiaries.

23. Chaudhry Ahmed was a resident of Guilford County and is the owner and registered agent of Dune and the owner and registered agent of Prospect. According to Medicare enrollment documents, Ahmed is listed on the Form CMS-855S as the owner of both Dune and Prospect. Ahmed electronically signed the document and agreed that he would not present, or cause to be presented, any false or fraudulent claim for payment to Medicare.

## The Scheme

24. From on or about April 27, 2024, through present, Medicare received complaints from hundreds of beneficiaries or providers claiming that Dune was fraudulently billing Medicare for DME that the beneficiaries never received, requested, or needed, or the provider never ordered. To date, over 580 complaints have been received related to Dune.

25. From on or about June 1, 2024, through present, Medicare received complaints from hundreds of beneficiaries or providers alleging that Prospect was fraudulently billing Medicare for DME that the beneficiaries never received, requested, or needed, or the provider never ordered. To date, over 450 complaints have been received related to Prospect.

## Claims Analysis: Dune

26. A review of Medicare claims data revealed that Dune began submitting claims to Medicare around April 2024. Then from around April 2024 through around August 19, 2024, Dune submitted more than 36,000 claims for over 20,000 Medicare beneficiaries, resulting in claims reimbursement requests of over $56.3 million.

27. Data analysis showed that Medicare has approved disbursement of more than $15.4 million to Dune.

28. Of the total claims Dune submitted to Medicare, more than $54.1 million were billed to Medicare in the 60-day period ending August 19, 2024, which represented an increase of over 2,400% when compared to the previous 60 days. Based on my training and experience, I know that a significant increase in claim submission over a short period of time, as reflected in Dune's billings to Medicare, can be indicative of fraud.

29. Furthermore, analysis of claims data showed that for approximately 67% of the claims Dune submitted, the beneficiary who allegedly received DME had no prior relationship with the provider who allegedly ordered the DME. This is significant because, as explained, a DME order must be prescribed by an appropriate licensed medical provider based on the beneficiary's underlying condition. If a medical provider has no prior relationship with the beneficiary, it indicates the provider may not be one of the beneficiary's regular medical providers as well as they may not know whether the DME equipment was medically necessary. Based on my training and experience, I know that a high percentage of claims in which there is no prior relationship between the ordering provider and the beneficiary, as reflected in Dune's billings to Medicare, can be indicative of fraud.

30. Claims data also showed that approximately 75% of the beneficiaries on whose behalf Dune billed Medicare were identified in a separate investigation indicating that their identities were compromised and used unlawfully by individuals to obtain fraudulent reimbursements from Medicare. Based on my training and experience, compromised Medicare beneficiary information is shared or exchanged between fraudsters and is often used in subsequent fraudulent claim schemes.

31. Dune also submitted claims to Medicare for more than 115 beneficiaries who were deceased prior to the date of service listed on the claim. Several of those beneficiaries died more than three years before the date of service listed on the claim.

### Claims Analysis: Prospect

32. A review of Medicare claims data revealed that Prospect began submitting claims to Medicare around May 2024. Then from around May 2024 through around August 19, 2024, Prospect submitted more than 28,000 claims for over 17,000 Medicare beneficiaries, resulting in claims reimbursement requests of over $45.6 million.

33. Data analysis showed that Medicare has approved disbursement of approximately $17.8 million to Prospect.

34. Of the total claims Prospect submitted to Medicare, more than $45.1 million were billed to Medicare in the 60-day period ending August 19, 2024, which represented an increase of over 8,600% when compared to the previous 60 days.

35. Furthermore, analysis of claims data showed that for approximately 70% of the claims Prospect submitted, the beneficiary who allegedly received DME had no prior relationship with the provider who allegedly ordered the DME. The significance of this is explained in paragraph 29.

36. Claims data also showed that approximately 77% of the beneficiaries on whose behalf Prospect billed Medicare were identified in a separate investigation indicating that their identities were compromised and used unlawfully by individuals to obtain fraudulent reimbursements from Medicare.

37. Prospect also submitted claims to Medicare for more than 50 beneficiaries who were deceased prior to the date of service listed on the claim. Several of those beneficiaries died more than three years before the date of service listed on the claim.

38. According to data analysis, Prospect submitted claims to Medicare for DME for at least 24 beneficiaries from Greensboro, North Carolina.

### Sample Interviews of Beneficiaries

39. Investigators interviewed numerous beneficiaries who submitted complaints to Medicare/HHS. For example, in or around July 2024, Dune submitted claims totaling approximately $1,963 to Medicare for a customized back brace (HCPCS L0637) purportedly provided to beneficiary D.U.

40. Law enforcement officers interviewed K.G., daughter of Medicare beneficiary D.U. K.G. advised her mother, who resides in an assisted living facility, received a box containing a back brace. The box also contained documents which referenced Medicare would pay for it. D.U. informed K.G. that she did not order the brace. K.G. noted D.U. has suffered chronic back pain for a long time but does not do anything to treat it other than aspirin. K.G. provided photos of the brace, packaging, and documentation.

41. Similarly, around August 2024, Dune submitted claims totaling approximately $1,715 to Medicare for a back brace (HCPCS L0651) purportedly provided to beneficiary K.D.

42. Law enforcement officers interviewed K.D. who confirmed she previously submitted a complaint regarding Dune Medical Supply. According to K.D., she received a box with no return label which contained a back brace. K.D. was not aware she was going to receive this brace because she does not have any problems with her back. She did not order the brace and believes her doctor would have called her if he had ordered it for her. K.D. attempted to contact Dune on two occasions. She left messages which were not returned.

43. Claims data revealed in or around July 2024, Dune submitted claims totaling approximately $4,397 to Medicare for a back brace and knee braces (HCPCS L0651, L2397, L1852) for Medicare beneficiary T.P.

44. Law enforcement officers interviewed T.P. T.P. stated that he received a package that contained an invoice and several back and leg braces that he had not requested. T.P. stated that he contacted his physician regarding these braces and his doctor's nurse confirmed there had been no order for these braces from their office. T.P. stated that he called a company in High Point about returning the braces, and he was told that they had a piece of paper with his doctor's signature on it. The employee at this company told T.P. not to worry, the braces had already been paid for and there would be no expense to him. T.P. stated that there were two companies involved in the shipment of the braces and the company in High Point was not the same as the company listed on the package.

45. Medicare claims data also revealed in or around June 2024, beneficiary, S.L., received a back brace and knee braces totaling approximately $4,397 (HCPCS L0651, L2397, L1852).

46. Law enforcement officers interviewed the alleged prescribing physician, Dr. S.P. Dr. S.P. confirmed she was informed by patient S.L. they had received a back brace and knee

braces. Dr. S.P. advised she did not order the braces and the patient does not have any medical problems which would necessitate a back brace or knee braces. Dr. S.P. does not recall receiving any phone calls or faxes asking her to sign an order for these items. Dr. S.P. noted she does not generally order braces as part of her practice.

47. Several Medicare beneficiaries for whom Prospect submitted DME claims reported in complaints to Medicare that the fraudulent DME packages they received showed that the package was shipped from Greensboro, North Carolina.

## Analysis of Activity in Bank Accounts

48. Investigators have obtained and reviewed information related to bank accounts in the name of Dune, Prospect, and Ahmed. Only the account relevant to this Affidavit is discussed below.

### *JPMorgan Chase Bank Account 5016*

49. JPMorgan Chase Bank account number 925915016 (Chase 5016) is a Simple Business Checking account in the name of Prospect Health Solutions Inc. Bank records show that Ahmed has access to this account.

50. Medicare records show that Prospect Health Solutions directed its claim reimbursements to Chase 5016, and that Medicare electronically deposits claim reimbursements to this account.

51. Through July 31, 2024, Medicare reimbursements accounted for more than 98% of the deposits and other credits to Chase 5016. Between June 4, 2024, and August 21, 2024, Medicare deposited approximately $8.9 million of claims reimbursement for DME into Chase 5016. Based on Medicare data, Medicare also deposited approximately $8.9 million into Chase 5016 from August 22 through August 30, 2024.

52. The balance in Chase 5016 as of August 22, 2024, was approximately $2.1 million. On August 23, 2024, investigators obtained and served a seizure warrant issued by Magistrate Judge Joe L. Webster for all funds on deposit, up to $8.9 million, in Chase 5016. (1:24MJ321-1). On or about September 10, 2024, the FBI received a check from Chase in the amount of $8.9 million in response to the seizure warrant.

53. Preliminary indications from Chase are that approximately $603,246.37 remains in Chase 5016, comprised of deposits from Medicare which were in transit or authorized after the date of the seizure warrant.

## Forfeiture Provisions

54. I am advised that Title 18, United States Code, Section 984 allows the United States to seize for civil forfeiture identical property found in the same place where the "guilty" property had been kept. I am further advised that the "fungibility" rule of Section 984(b) cannot reach back in time for an unlimited period. Section 984(b) provides:

> No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than one year from the date of the offense.

Because the conduct and financial activity under investigation occurred within the last four to five months, this Affidavit need not demonstrate that the funds now on deposit in the accounts described above are the particular monies involved in the offense, so long as the forfeiture is sought for other funds on deposit in that same account.

55. I understand that property subject to civil forfeiture may be seized pursuant to 18 U.S.C. § 981(b), and property subject to criminal forfeiture may be seized pursuant to 21 U.S.C. § 853(f). In cases where the Government is not certain at the time of the seizure if it will pursue civil or criminal forfeiture, courts may issue the seizure warrant under both statutes. The probable cause

showing is the same for Sections 981(b) and 853(f), except that the latter also requires a showing that a restraining order "may not be sufficient to assure the availability of the property for forfeiture."

56. An order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture because there is reason to believe that the property is in the custody of the defendant, who cannot reasonably be relied on to abide by an order to maintain the property in substantially the same condition as it is at the present time in order that it will be available for forfeiture. Furthermore, based on my training and experience I know that restraining orders served on banks sometimes fail to preserve the property for forfeiture because the bank representative receiving the restraining order fails to put the necessary safeguards in place to freeze the money in time to prevent the account holder from accessing the funds electronically, or fails to notify the proper personnel as to the existence of the order, or the bank exercises its own right of setoff to satisfy an outstanding debt owed to the bank by the account holder. In contrast, where electronic funds are concerned, a seizure warrant guarantees that the funds will be in the Government's custody once the warrant is served.

57. I expect that some or all of the property subject to seizure may be found outside the Middle District of North Carolina. Section 981(b)(3) of Title 18, United States Code, explicitly provides jurisdiction for the issuance of seizure warrants for property located in other districts. This statute provides as follows:

> Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of title 28, and may be executed in any district in which the property is found.

Issuance of the seizure warrant in this district is appropriate under the above statute, as this is the

district "in which ... the acts or omissions giving rise to the forfeiture occurred," 28 U.S.C. § 1355(b)(1)(A). As provided in 18 U.S.C. § 981(b)(3), the warrant may be "executed in any district in which the property is found."

## Conclusion

58. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that the property described in paragraph 2 above constitutes or was derived from proceeds traceable to the commission of a Federal health care offense and is therefore subject to seizure and forfeiture pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7).

59. Based on the foregoing I respectfully request that this Court issue a seizure warrant for the property described in paragraph 2 above.

This the 3rd day of October 2024.

/s/ David Yu
David Yu
Special Agent
Federal Bureau of Investigation

In accordance with Rule 4.1(b)(2)(A), the Applicant appeared before me by telephone, was placed under oath, and attested to the contents of this Application, which was submitted to me by reliable electronic means.

This 3rd day of October 2024.

_____
Honorable L. Patrick Auld
United States Magistrate Judge
Middle District of North Carolina